# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ANTONIA KOCH,

         **Petitioner,**

   **v.**                               **Case No. 05C1158**

DANE KOCH,

         **Respondent.**

## DECISION AND ORDER

Petitioner Antonia Koch ("Antonia") alleges that her estranged husband, respondent Dane Koch ("Dane"), wrongfully removed their children, Charles, age six, and Annalena, age three, from Germany to the United States. Pursuant to the Hague Convention on Civil Aspects of Child Abduction, Oct. 25, 1980, T.I.A.S., No. 11,670, 1343 U.N.T.S. 89, ("the Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq. (the "ICARA"), which implements the Convention, Antonia asks me to return the children to her in Germany, and Dane opposes the request. The principal issue is whether Dane's removal of Charles and Annalena was "wrongful" as defined by the Convention.

## I. FACTS

Dane, a United States citizen, served in the military in Germany from 1987 to 1990, after which he remained in Germany where he worked, married, had two children and divorced. In 1997, he met Antonia, a German citizen, and in 1999, they moved to the United States where they married. On February 20, 2000, Antonia give birth to Charles, and on April 2, 2002, to Annalena, both of whom have dual United States and German citizenship. Dane started a business, which failed, and Dane and Antonia went through

bankruptcy.  The couple also experienced marital difficulties, and on at least one occasion Dane physically abused Antonia.  On April 13, 2002, after Dane's previous employer offered him a job, Dane and Antonia and their children returned to Germany.  Although Dane and Antonia disagree about how long they intended to remain in Germany (Dane indicates two to three years and Antonia five to ten), they agree that they intended to save enough to make a down payment on a home and purchase two cars (an amount they estimated at about $20,000) and then return to the United States.

In Germany, Antonia and Dane ultimately settled in Eschenbach where Dane obtained a three-year renewable work permit (the longest permit available), and they enrolled Charles in kindergarten.  The couple continued to experience marital difficulties, and Dane's  physical abuse continued causing Antonia to spend one night with a friend and another in a shelter.  In December 2004, Antonia told Dane that she wanted a divorce, and he angrily pushed  her onto their bed and choked her in front of the children.  The next day, Antonia reported the incident to the police and took the children to Taunusstein, her home town, about 180 kilometers from Eschenbach.

On December 17, 2004, Dane picked up the children for a visit.  Instead of returning them, however, he took them to the United States.  Dane called Antonia and told her that if she refused to come back to him, he and the children would remain in the United States. In the meantime, Antonia secured an apartment in Taunusstein and obtained an ex parte order from a German court awarding her the right to determine where the children would live.  On January 21, 2005, Dane returned to Eschenbach with the children, and Antonia retrieved them and took them to Taunusstein where she enrolled them in school and cared for them with help from her mother.  However, Charles experienced emotional problems,

2

and in March 2005, he went to Eschenbach to stay with Dane. However, because of his work schedule, Dane could not provide adequate care for Charles and after about ten days returned him to Antonia.

In April 2005, Dane called Antonia after midnight and said that he was en route to Taunusstein. During the three to four hour drive, he called her approximately fifty-five times and made a variety of threats. When he arrived, Antonia called the police, and they arrested Dane. The next day, Antonia obtained a restraining order barring Dane from contacting her. However, with her agreement, Dane continued to visit the children. On May 5, 2005, Dane picked up the children for what was supposed to be a weekend visit, but on May 7, he and the children flew to the United States. Antonia discovered his plan to depart and called the police, who attempted to prevent him from taking the children out of Germany but arrived at the airport too late to do so. Dane did not tell his employer or his landlord of his plan to leave Germany. In addition, he took Antonia's address book, which made it difficult for her to contact friends in the United States.

Antonia immediately contacted the German consulate in Chicago, which directed her to the National Center for Missing and Exploited Children ("Center"). She also called Dane's mother in Wisconsin, who falsely informed her that she did not know the whereabouts of Dane and the children. In September 2005, Antonia discovered that Dane and the children were living with his parents, at which point the Center referred her to an attorney, who initiated the present action.

In September 2005, Dane obtained an ex parte order from a Wisconsin court awarding him temporary custody of the children.

## II.  DISCUSSION

The signatory nations adopted the Convention "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  Convention, Preamble.  Both Germany and the United States are signatories of the Convention.  Pursuant to article 19 of the Convention and § 11603(a), a United States district court has the authority to determine the merits of an abduction claim but not of the underlying custody dispute.  Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993).

The Convention attempts to deter the international abduction of children by one parent during the breakdown of a marriage.  Adair Dyer, Report on International Child Abduction by One Parent ('Legal Kidnapping'), Preliminary Document No. 1 of August 1978, reprinted in Hague Conference on Private International Law, III Actes et Documents de la Quatorzième Session, October 6-25, 1980, at 40 (1980).  It seeks to achieve this goal by rendering international abductions void of any jurisdictional consequence in ensuing custody disputes, i.e., by restoring the status quo that existed before the abduction so that a court in the child's place of habitual residence may make the final decision as to custody.  Elisa Perez-Vera, Explanatory Report, Hague Conference on Private International Law, Actes et documents de la Quatorzieme session vol. III, 1980, p. 426 at *15 (hereinafter "Perez-Vera Report"); see also Friedrich, 983 F.2d at 1402 (stating that the Convention addresses "situations where one parent attempts to settle a difficult family situation and obtain an advantage in any possible future custody struggle, by returning to the parent's native country, or country of preferred residence").

4

Under the Convention, the removal of a child from one country to another is wrongful when:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the state in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention

Convention art. 3. Under ICARA, Antonia has the burden of showing by a preponderance of the evidence that the removal was wrongful. § 11603(e)(1). If she meets this burden, the burden shifts to Dane to establish one of several affirmative defenses including that Antonia was not actually exercising her right of custody at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention. Convention art. 13a; § 11603(e)(2)(B).

Therefore, Antonia must first establish that Dane removed Charles and Annalena from their habitual residence. In determining whether Charles and Annalena had become habitually resident in Germany, I focus on the point in time "immediately before the removal or retention." Convention art. 3. I commence the inquiry by looking at the text of the Convention. Air France v. Saks, 470 U.S. 392, 397 (1985). However, "treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations and the practical construction adopted by the parties." Id. (quoting Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-33 (1943)). Further, in implementing the Convention, Congress recognized "the need for uniform international interpretations of the convention," §

5

11601(b)(3)(B), thus "the subsequent interpretation of [the Convention] by the signatories helps clarify the meaning of terms."  Air France, 470 U.S. at 403.

The Convention does not define "habitual residence."  Nor has the Seventh Circuit had occasion to do so.  The drafters of the Convention intentionally left habitual residence undefined for several reasons.  First, they wished courts to give the phrase "the ordinary and natural meaning of the two words which it contains," In re J. (A Minor), [1990] 2 A.C. 562 (H.L.) (appeal taken from England) (U.K.), available at www.incadat.com.   Second, they wanted courts to avoid the overly technical definitions sometimes associated with the concept of domicile.  Eugene F. Scoles, et al., Conflict of Laws § 4:14 (4th ed. 2004). Finally, the drafters wished to emphasize that the determination as to a child's habitual residence was largely one of fact.  Perez-Vera Report, supra, at *25; see also In re J. (A Minor), [1990] 2 A.C. at 578 (stating that the question whether a person is or is not habitually resident in a specified country "is a question of fact to be decided by reference to all the circumstances of any particular case").

Thus, I begin the analysis by ascertaining the ordinary meaning of the words "habitual residence."  Dictionaries define residence as the place where an individual resides or lives, his or her abode or dwelling.  E.M. Clive, The Concept of Habitual Residence, Jurid. Rev. 137, 139 (1997).  And they define "habit" as a settled disposition or tendency to act in a certain way.  Id.  The word "habitual" has a corresponding meaning. See Dickson v. Dickson, [1990] S.C.L.R. 692, 699 (U.K.), available at www.incadat.com (stating that "[b]y mere reference to the dictionary, I am inclined to give 'habitual' its particular meaning of 'customary' or 'normal'").  Thus, habitual residence "connotes actual residence plus some continuity and persistence even though it does not connote the

6

intended permanence or emphasis on expressed intent often associated with domicile." Scoles, supra, § 4:14. Or as Professor Bodenheimer, who participated in the drafting of the Convention, put it, "habitual residence . . . requires physical presence in a place for a period of time, together presumably with the maintenance there of a place of abode." Brigitte M. Bodenheimer, The Hague Convention on International Child Abduction, 11 Fam. L.Q. 99, 104 n.25 (1981).

In addition, in considering the meaning of habitual residence, it is important to keep in mind the context in which the phrase is used. In the context of international parental abduction, "the policy underlying the concept of habitual residence is to both prevent unilateral removals of children by one parent and to identify the place where the children are settled and where recent information about the quality of family life is available. " Linda Silberman, Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence, 38 U.C. Davis L. Rev. 1049, 1065-66 (2005).

Thus, the most important fact in the habitual residence calculus will usually be the duration of the child's stay in a country. Generally speaking, a child will be found to be habitually resident in a country if he or she has been living there for a sufficient period of time. Where there is geographic stability and adequate duration, questions as to the purpose of the residence will usually be pushed into the background. Clive, supra, at 140. Further, to the extent that purpose plays a part in determining whether a child is habitually resident in a country, it is only necessary that there be

> . . . a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed, his purpose while settled may be for a limited period. Education, business or profession, or employment, health,

7

> family or merely love of the place spring to mind as common reasons for a
> choice of regular abode. All that is necessary is that the purpose of living
> where one does has a sufficient degree of continuity to be properly described
> as settled.

In re Bates, No. C.A. 122-89 (Fam. Div. 1989) (U.K.), available at www.hiltonhouse.com.

Courts in most signatory nations approach the issue of habitual residence as described above. For example, in Zenal v. Haddow, [1993] S.L.T. 975 (U.K.), available at www.hiltonhouse.com, a Scottish court found that after fifteen months, a child had become habitually resident in Australia notwithstanding averments that the parents had no settled intention to remain there. The court stated that "while intention is undoubtedly a very important consideration, there must come a stage when the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place." Id. at 979. In Johnson v. Johnson, Nytt Juridiskt Arkiv [NJA] [Supreme Court] No. 7505-1995 (Swed.), available at www.hiltonhouse.com, a Swedish court found that a child who had been living in Sweden for over two years had become habitually resident there even though the parents initially intended that her stay in Sweden would be limited in time, and included a provision in their custody agreement providing that the child's habitual residence would remain in Virginia. The facts of location, duration and settlement prevailed over the parents' original intention. And in In re A. (A Minor), [1996] 1 All E.R. 24, 32 (U.K.), available at www.hiltonhouse.com, an English court held that children had become habitually resident in Iceland after living there for two years with their mother and father, the latter who had been stationed in Iceland as a U.S. serviceman on a military base. The children's settled residence in Iceland prevailed over the fact that the father's posting was expected only to last for approximately three years.

8

Courts on this side of the Atlantic have approached the issue of habitual residence similarly. In Droit de la famille, [1996] R.D.F. 512 (Quebec Sup. Ct.) (Can.), the Superior Court of Quebec concluded that a family, who lived in California for three years with their six and three-year old children, was habitually resident in California. The court rejected the mother's argument that the children had not become habitually resident in California because the family had only intended to be in California for three years. And in Chan v. Chow, 199 D.L.R. (4th) 478 ¶ 45 (B.C.C.A. 2001) (Can.), the British Columbia Court of Appeals held that the parties' nine months residence in Hong Kong satisfied the appropriate period of time requirement and that the circumstances in which the parties lived, worked and interacted in Hong Kong demonstrated that both had a settled intention to make Hong Kong home for the time they resided there. Thus, the court found their child habitually resident in Hong Kong.

In determining habitual residence, courts in the United States have also focused primarily on the factors of geography and duration. For example, in Shealy v. Shealy, 295 F.3d 1117, 1121-22 (10th Cir. 2002), the Tenth Circuit noted that a four year old, who at age one had moved with her family to Germany for her mother's three year tour of duty in the military, had become habitually resident in Germany. In Rydder v. Rydder, 49 F.3d 369, 373 (8th Cir. 1995), the Eighth Circuit affirmed a district court's conclusion that two children, ages four and two, who moved with their family from Sweden to Poland for two years because of their father's job, were habitually resident in Poland, notwithstanding the family's maintenance of Swedish residency. In Shalit v. Coppe, 182 F.3d 1124, 1128 n.5 (9th Cir. 1999), the Ninth Circuit noted that a five year old, who had resided with his father in Israel for three years had become habitually resident there as "[t]hree years is certainly

9

enough time for [the child] to be considered 'settled' in Israel, regardless of [his mother's] claimed intention to have him return permanently to Alaska at some point in the future." And in Whiting v. Krassner, 391 F.3d 540 (3rd Cir. 2004), the Third Circuit concluded that a two year old child, who had lived with her mother in Canada pursuant to her parents' agreement, had become habitually resident in Canada despite the fact that her parents intended that she would later return to the United States to live with her father.

However, beginning with the Ninth Circuit's decision in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001), a number of courts in the United States have approached the question of habitual residence somewhat differently. Rather than beginning the analysis by looking at the facts of geography and duration, they ask whether the parents intended to abandon their previous habitual residence. See, e.g., Gitter v. Gitter, 396 F.3d 124, 133 (2d Cir. 2005); Holder v. Holder, 392 F.3d 1009 (9th Cir. 2004); Ruiz v. Tenorio, 392 F.3d 1247 (11th Cir. 2004). In Mozes, the children moved from Israel to the United States with their mother for an anticipated fifteen months while their father remained in Israel, where he maintained the family's home and his job, the sole source of the family's income. After a year in the United States, the mother filed for divorce, and the father filed a petition under the Convention to have the children returned to Israel. The district court found that the children's habitual residence had shifted to the United States. However, the Ninth Circuit reversed and remanded stating that for the United States to be the children's habitual residence, "the agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence." Id. at 1081.

While Mozes is a "carefully-reasoned opinion," which attempts to effectuate "the goals of the Convention" such as preventing "unilateral decisions to move a child," Silberman, supra, at 1065, its assertion that the starting point of the habitual residence analysis is whether the parents intended to abandon a previous habitual residence appears to be inconsistent with the intent of the drafters of the Convention and with the jurisprudence of other signatories. Professor Weiner believes that Mozes involved unwarranted "judicial creativity," and that

> the court did two things that were quite remarkable. First, it articulated a detailed roadmap for how a court is to evaluate a child's habitual residence. This was a departure from the non-technical fact-based approach followed by most courts. Second, it departed from the view that a joint intent by the parents to move plus some sort of settled purpose was enough to change a child's habitual residence. The Ninth Circuit stated that parents now need a shared intent to forego the prior habitual residence (or evidence of the child's significant acclimatization to the new place).

Merle H. Weiner, Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention in the Civil Aspects of the International Child Abduction, 33 Colum. Hum. Rts. L. Rev. 275, 279-80 n.15 (2002).

Further, Mozes's approach to the issue of habitual residence has had an unfortunate effect on Convention jurisprudence in United States courts. Courts relying on Mozes have in some instances made seemingly easy cases hard and reached results that are questionable at best. Ruiz is an example. There, the parties moved with their children from the United States to Mexico and lived in Mexico for almost three years. Nevertheless, noting that the mother did not intend to move to Mexico permanently, the district court characterized the family's stay in Mexico as a "trial period." In affirming the district court's finding that the children's habitual residence remained in the United States, the Eleventh

11

Circuit placed great emphasis on the parties' subjective intent and gave less weight to objective facts such as the length of time the family lived in Mexico, and the facts that the parents built a house and the children attended school in Mexico. In seeking to distinguish Feder v. Evans-Feder, 63 F.3d 217 (3d Cir. 1995), in which the Third Circuit held that the mother's ambivalence about moving to Australia did not negate the objective facts indicating that the family had established residence there, the Eleventh Circuit emphasized that both parents had reservations about moving to Mexico.

Ruiz placed undue weight on the difficult to ascertain intentions of the parties. Silberman, supra, at 1067. Contrary to the wishes of the drafters of the Convention, the court in effect equated habitual residence with domicile, which generally requires an intent to remain. Courts that focus on the duration of a family's stay in a country and the objective facts surrounding it will generally be able to distinguish between temporary visits such as sabbaticals and/or limited stays involving only one parent and situations where parties establish habitual but not necessarily permanent residences. However, guided by Mozes, the Ruiz court unnecessarily embarked on an inquiry into the parties' motives including their possible reservations about permanent relocation. "More often than not, such an approach will yield conflicting testimony, introduce an inappropriate element of subjectivity, and ultimately impair the operation of the Convention." Id.

That an approach to habitual residence which emphasizes parental intent to abandon a previous habitual residence and establish a new one is at odds with the Convention is evidenced by the Convention's handling of so-called "shuttle custody" cases. Such cases typically involve parental agreements that a child will reside with a parent for a year or two, and then return to the other parent. Sometimes, the parents provide in the

12

agreement that they intend the child's habitual residence to remain in a particular country. In 1997, a Special Commission established by the Convention rejected the proposition that parents could by means of an agreement establish a child's habitual residence "that does not match with the factual residence of the child." Report of the Third Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction ¶ 16 (17-21 March 1997), Permanent Bureau of the Hague Conference on Private International Law p. 78 (1997) [hereinafter "Commission Report"]. The Commission reiterated that "the concept of habitual residence under the Convention is regarded as a purely factual matter." (Commission Report ¶ 16); see also Whiting, 391 F.3d at 540; and Watson v. Jamieson, [1998] S.L.T. 180 (U.K.), available at www.incadat.com, (both concluding that children living with a parent pursuant to an agreement specifying that the child would return to the other parent in two years were nevertheless habitually resident with the current custodial parent).

In the present case, relying on Mozes and its progeny, Dane asks me to begin the analysis by inquiring as to whether he and Antonia intended to abandon the United States as their habitual residence. He argues that because they planned to return to the United States, they did not intend to abandon their habitual residence there, thus Charles and Annalena remained habitual residents of the United States. Dane's argument might be persuasive if the issue before me were domicile rather than habitual residence. For, as indicated, intent is often relevant to domicile. However, the issue is habitual residence and for the reasons stated, the approach to the issue that Dane advocates is inconsistent with that of most Convention signatories and with the goals of the Convention. While parental intent may be a factor in close habitual residence cases, it is not the starting point of the

13

analysis.  Rather, as discussed, the inquiry into habitual residence begins with the facts on the ground, most importantly those of geography and duration.

In the present case, Charles and Annalena lived in Germany for a relatively long time – over three years.  Thus, as previously discussed, their parents' long term plans regarding residence are largely irrelevant.  Moreover, Dane, Antonia and the children were not in Germany on a visit nor was this a situation where one parent remained behind.  Rather, the family moved to Germany as a family because Dane found work there.  They took all of their belongings with them except for a few large items and established a home and a life in Germany. Dane worked, Antonia cared for the children and Charles attended school.  Further,  Dane and Antonia were not strangers to Germany, both having lived there for most of their adult lives.  Thus, there can be little doubt that Charles and Annalena became habitual residents of Germany.

Moreover, finding Charles and Annalena habitual residents of Germany best serves the policy underlying the concept of habitual residence in the context of international parental abduction.  That policy is to prevent the unilateral removal of children by one parent and to identify the place where the children are settled and where recent information about the quality of family life is available.  In the present case, Dane unilaterally removed the children from the place where they were settled – Charles had lived in Germany since he was two and Annalena since infancy – and from the place where information about the quality of their lives was available.

Even if I considered whether Dane and Antonia intended to abandon their habitual residence in the United States, I would conclude that they did so.  At the time of their separation, they had lived in Germany for almost three years.  See Mozes, 239 F.3d at

14

1075 (noting that when one has "lived continuously in the same place for several years on end, for example, we would be hard-pressed to conclude that you had not abandoned any prior habitual residence"). Further, prior to their separation Dane and Antonia had made no plans to return to the United States in the near future and had accumulated nowhere near the $20,000 they planned to save before returning.

Thus, at the time Dane removed them from Germany, Charles and Annalena were habitual residents of Germany. Further, at such time Antonia had rights of custody of the children and was exercising such rights. Even putting aside the court order granting her the right to determine where the children would live, she and Dane shared equal joint custody pursuant to German law. Burgerliches Gesetzbuch [BGB] [German Civil Code] §1626(1). Therefore, Dane's removal of the children was wrongful under article 3 of the Convention.

Dane makes several other arguments, which require little discussion. He argues that I should not return the children to Germany because they will not live in Eschenbach where they lived before their parents' separation. However, the Convention does not require children to be returned to any particular locality in the country in which they are habitually resident. Perez-Vera Report, supra, at 459-60. Further, the children lived with Antonia in Taunusstein prior to their removal from Germany, thus it is hardly foreign to them. Dane also argues that Antonia acquiesced in the removal of the children. Based on the testimony at the hearing and the fact that Dane attempted to hide the whereabouts of the children from Antonia, I find this assertion incredible and therefore reject it.

Antonia also requests fees and costs. ICARA requires me to award such fees and costs to a successful petitioner unless doing so would be "clearly inappropriate." §

15

11607(b)(3). Based on Dane's actions in the present case, I do not find it clearly inappropriate to order fees and costs.

### III. CONCLUSION

Therefore,

**IT IS ORDERED** that pursuant to the Convention, Charles and Annalena are to be returned to Germany on or before March 1, 2006.

**IT IS FURTHER ORDERED** that Dane pay the fees and costs that Antonia incurred in connection with the petition, including, but not limited to legal fees, court costs and transportation costs.

Dated at Milwaukee, Wisconsin this 20 day of February, 2006.

/s_____
LYNN ADELMAN
District Judge

16